JENNIE BARDSLEY, PLAINTIFF-APPELLANT, v. THE FIRST NATIONAL BANK AND TRUST COMPANY OF MONTCLAIR, A CORPORATION, DEFENDANT-RESPONDENT.

MARY W. DAMEREL, PLAINTIFF-APPELLANT, v. THE FIRST NATIONAL BANK AND TRUST COMPANY OF MONTCLAIR, A CORPORATION, DEFENDANT-RESPONDENT.

Submitted May 26, 1933—Decided September 27, 1933.

For the appellants, *Riker & Riker* (*Theodore McC. Marsh,* of counsel).

For the respondent, *Wolber, Gilhooly & Yauch* (*John H. Yauch, Jr.,* of counsel).

The opinion of the court was delivered by

HEHER, J. The appeal in each cause is from a judgment of the Essex County Circuit Court, striking out the complaint as sham and frivolous in part. Appellants allege the conversion of certain bonds and mortgages and mortgage participation certificates owned by them, respectively, and deposited with respondent as collateral security for the payment of promissory notes made or endorsed by William W. Bardsley, the son of appellant, Jennie Bardsley, and a cousin of appellant Mary W. Damerel. The securities consisted of three bonds and mortgages and two mortgage participation certificates of the aggregate principal sum of $25,000, furnished by appellant Bardsley, and two bonds and mortgages, of the total principal sum of $10,000, provided by appellant Damerel.

On December 30th, 1931, respondent advised appellant Bardsley, by letter, that the securities "given by you to your son to use as collateral here must now be considered our property, due to his inability to keep up his interest charges." On the same day appellant Damerel was advised, likewise by letter, that the "mortgages given by you to Mr. William W. Bardsley for collateral purposes must now be considered the property of this bank." Respondent also gave notice to the mortgagors to pay to it the interest therafter accruing on the securities. William W. Bardsley's obligation to respondent,

on promissory notes made by him, then totaled $26,600, and, in addition, he was liable as an endorser of a promissory note in the sum of $14,000, made by a corporation in which he was interested.

Appellants contend (a) that they are the pledgors; (b) that the securities "occupy the status of surety, as they are pledged for the debt of a third party;" (c) that the lien was discharged by various acts of respondent, viz.: (1) assuming ownership of the securities; (2) selling the same before maturity; (3) selling the same at private sale; (4) selling the same without notice; (5) renewing debt of principal without consent of pledgor-surety; (6) bad faith on the part of respondent; and (d) that the lien having been discharged, the refusal of respondent to return the securities on demand constituted conversion.

Was the status of appellants and respondent that of pledgor and pledgee? This query must be answered in the negative. Each appellant executed and delivered to respondent an authority to pledge, wherein she consented and agreed that her securities therein listed "may be pledged with you as collateral security" for loans or advances "made or to be made to," and "any and all other obligations of" William W. Bardsley, "now existing or hereafter arising * * *." It was therein further stipulated that the pledged securities "may be sold or otherwise disposed of in order to satisfy any or all of said obligations" of William, in the event of default at maturity, and notice of the nonpayment of the obligations was waived.

Appellants concede that the language of this instrument, if it stood alone, "might be construed as a pledge" by William "to the bank rather than a pledge by the owners of the securities direct," but they insist that a pledge by each appellant is found in the transfer of the securities direct to the bank by her assignment, absolute on its face, and the knowledge of respondent of the source and ownership of the securities.

It is not indispensable that the pledge should belong to the pledgor. One may make a valid pledge of property belonging to another, if he has the owner's consent to use it in

this way. Such consent may be either express or implied. But his authority to pledge cannot be inferred merely from his possession of the property. Tacit consent must be inferred from circumstances so strong as to leave no doubt of the owner's intention, as if he was present at the making of the contract, or if he himself delivered to the creditor the thing pawned. *Jones on Collateral Securities* (3*d ed.*) § 53.

The character of the transaction is determined by the intention of the parties. The intention to invest William with authority to pledge these securities in his own transactions with respondent is clearly expressed. That was the evident purpose of the authority to pledge; otherwise, it would be unnecessary. The securities were not thereby pledged. The owner consented that they *may* be pledged as security for any loans made *or to be made* to, and any and all other obligations of, William, now existing or *hereafter* arising. A general authority to pledge was thereby vested in William. It was not limited to existing obligations, and he was in nowise restricted in the use of the collateral to secure obligations thereafter arising. In the authority to pledge executed by his mother there was another provision that makes the intention evident. She consented "to the delivery of the securities to the *borrower* upon his receipt."

William was given possession of the securities. He delivered them to respondent. In his affidavit submitted to the court below, he stated that he advised officers of the respondent bank "that the security given by him had been *borrowed* from either Jennie Bardsley or Mary Damerel." He was undoubtedly the pledgor of the securities. He bore that relationship to respondent. He deposited the securities with respondent pursuant to the provisions of a collateral agreement, signed by him alone, providing that upon failure to satisfy, as they mature, his obligations to respondent, whether then existing or thereafter incurred, the latter could sell the same at public or private sale, at such price as it might deem best, without demand, advertisement, notice to redeem or other notice to William. Respondent was therein expressly

authorized to purchase the securities so sold, free from any right or equity of redemption in William Bardsley.

It is not contended that William, in the making of this collateral agreement, exceeded his authority, nor would such contention have merit, for he was obviously authorized to pledge the securities on terms satisfactory to him. It follows, therefore, that William was the pledgor, and that appellants, in respect of these securities, did not have the status of sureties.

There is no merit in the claim that there was a conversion of the securities. Appellants insist that this resulted when, as stated in the letter of December 30th, 1931, respondent "assumed to exercise dominion and control over such securities as the owner thereof." The collection of thereafter accruing interest on the securities is pointed to as evidence of the continued exercise of dominion and control thereof. It is contended that on December 30th, 1931, none of William's obligations was in default, and that the taking of the securities, as stated in the letter, constituted a conversion. At that time a note in the sum of $14,000, made by William, and held by respondent, which matured on November 28th, 1931, was in default. Appellants concede that the collateral agreement granted to respondent the option to declare all of William's obligations due and payable, in the event of a default in the payment of one, but they insist that prior to December 30th, 1931, the parties had agreed to apply the proceeds of one of the mortgages, $13,025.33, to the satisfaction *pro tanto* of the note in default, and that, in any event, the option in question had not been exercised. The proofs show that the proceeds of this mortgage were not credited on the obligation in question until January 4th, 1932, when respondent advised William, by letter, that it had succeeded in disposing of the mortgage, and that the proceeds had been credited on the note in default. Respondent's vice-president expressed a willingness to renew two of William's notes, which would mature in a few days, and suggested that there be a renewal note for $13,574.67, the aggregate of these and the balance due on the note in default. William apparently did not act

upon this suggestion. On January 12th. appellants, through counsel, claiming a breach of contract, demanded the value of the securities. Thereafter, respondent, who had not parted with the title to the securities here involved, offered to return them to appellants upon payment of the obligations they were given to secure. This proposal was rejected.

Manifestly, the respondent, in taking over the securities, was exercising a right conferred by its contract, embodied in the $14,000 collateral note, made on October 28th, 1931. Under the contract it was privileged to sell, in the event of a default, at public or private sale, without demand, advertisement, notice to redeem or other notice to William, and the right to purchase, free from any right or equity of redemption was expressly reserved. It thereby exercised its option conferred by the contract to declare all of William's obligations immediately due and payable. The offer subsequently made, when a sale of the $13,000 mortgage was effected, to accept renewals of the remaining obligations was entirely consistent with the prior exercise of the option. The sale of the mortgage had improved William's position. Respondent's vice-president, in the letter of January 4th, expressed the opinion that this would reduce his monthly interest charges "to such an extent that you can keep your other paper here in good standing."

But assuming that respondent's course, in thus taking over the securities, was without legal warrant, it did not constitute conversion. It was, in effect, a private sale by respondent to itself. The aggregate principal sum of the securities was credited on the obligation, and a sale could not possibly bring more. If the sale is ineffectual to change the title to the property, the status of the parties remains unaltered. The sale is not void, but voidable at the election of the debtor. The debtor is at liberty to ratify the sale, and, should he do so, it would be valid for all purposes. The ratification would make it lawful and relieve it from any imputation of being tortious as to the debtor. The pledgee's title to the property would thereby become perfect, and the debtor would be entitled to credit upon his debt for the net

proceeds of the sale. But if the debtor does not do this, and elects to treat the purchase by the pledgee as illegal, the sale thereupon is void, and the parties are remitted to their rights as they existed before any sale was made or attempted. The debtor is liable upón his debt, and the creditor still holds the property in pledge. *Elrae Corp.* v. *Bankers' Trust Co.,* 105 *N. J. Eq.* 501, 512; *affirmed,* 110 *Id.* 66; *Sokoloff* v. *Wildwood Pier and Realty Co.,* 108 *Id.* 362.

As stated by Mr. Justice Williams, in *Glidden* v. *Mechanics' National Bank,* 53 *Ohio St.* 588; 42 *N. E. Rep.* 995: "Under a contract of pledge, the right of the pledgee to retain possession of the property continues until the debt or engagement for the security of which it was pledged has been discharged by payment or performance; or a tender and demand for its return. * * * On the other hand, in the absence of any stipulation to the contrary, it is the duty of the debtor to seek the creditor at the proper place and pay the debt, or tender its payment, before he is entitled to receive back the pledge. These obligations of the parties are reciprocal, and neither can require performance by the other without himself being able and ready to perform on his part; so that, the possession of the pledgee being lawful as long as he retains the actual control and custody of the pledge, with the ability to perform his obligation by restoring it, he is not in default until a demand, accompanied by a tender of the debt, is made. If he then refuse or fail to restore the pledge, he may be charged with its value. The action for its recovery, though treated as one for conversion, is in reality founded on the breach of the contract, and hence the creditor is entitled to recoup his debt." Such is the prevailing rule. *Jones on Collateral Securities* (*3d ed.*) § 637; 49 *C. J.* 1006; *Bowers on Conversion,* § 48.

In such a situation a mere assertion of ownership, which in nowise injures or prejudices the owner of the property, does not constitute conversion. Respondent did not put it out of its power to restore the securities. A nominal transfer of the pledge, which does not put the property beyond the control of the pledgee, does not amount to a conversion of the

pledge. The fact that a pledgee attempts to assert a larger right in the property than he can maintain does not of itself constitute a conversion of it, it being clear that he is entitled to possession as a pledgee. *Donnell* v. *Wyckoff,* 49 *N. J. L.* 48; 7 *Atl. Rep.* 672; *In Jeanes' Appeal,* 116 *Pa. St.* 573; 11 *Atl. Rep.* 862; *Radigan* v. *Johnson,* 174 *Mass,* 68; 54 *N. E. Rp.* 358; *Field* v. *Sibley,* 174 *N. Y.* 514; 66 *N. E. Rep.* 1108; 49 *C. J.* 950.

The collection of interest did not constitute conversion. In the absence of an express agreement to the contrary, the pledge of securities includes the interest payable thereon. *Donnell* v. *Wyckoff, supra.*

Judgment affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.

*For reversal*—None.