27933. SMITH, executor, *v.* COURTS *et al.*

DECIDED FEBRUARY 5, 1940.  REHEARING DENIED MARCH 6, 1940.

*Alex. McLennan,* for plaintiff.

*Alston, Foster, Moise & Sibley,* for defendants.

SUTTON, J.  D. O. Smith Jr., as executor of the last will and testament of D. O. Smith, filed in the civil court of Fulton County a suit in trover against Courts & Company, a partnership, and the individual members thereof, to recover 75 shares of stock of the

New York Central Railroad Company. The answers of the defendants alleged that they held no stock belonging to the estate of D. O. Smith, denied that they were indebted to the estate in any sum whatever, and set up certain contracts, hereinafter referred to, under which it was alleged that Courts & Company had the right to pledge and dispose of the stock sued for. They pleaded also an alleged release. On the trial the court directed a verdict in favor of the defendants. The exception is to a judgment overruling the plaintiff's motion for new trial.

The case made by the record is substantially as follows: Courts & Company are brokers and dealers in securities in the City of Atlanta. Rossignol & Crocy Inc. was also a broker and dealer in securities in Atlanta, and with Courts & Company had dealings in the purchase and sale of securities. These dealings were in pursuance of a written contract dated July 11, 1933, which, among other things provided that Courts & Company would extend credit to Rossignol & Crocy Inc., which, to secure the indebtedness, pledged all the securities in the account which Courts & Company had against it, giving to them the power to sell the pledged securities whenever necessary for the purpose of paying the indebtedness, all transactions to be subject to the rules, regulations, and customs of the exchange or market, and its clearance house, if any, where executed by Courts & Company. Rossignol & Crocy Inc. was not a member of the New York Stock Exchange, and, wishing to buy and sell stocks on that exchange, would give to Courts & Company, who were members, orders to buy stocks and bonds. Courts & Company would execute the orders, advance their own funds, charge the prices to Rossignol & Crocy Inc., receive the securities and carry them in the account of Rossignol & Crocy Inc., as arranged by the agreement of July 11, 1933. The record of their dealings with Rossignol & Crocy Inc. was carried by Courts & Company in three accounts. The "Regular Account" was a record of transactions which were to be carried for a more or less indefinite period of time. The "Cash Account" was a record of transactions in securities which were to be ordered out and paid for when they reached Atlanta, and in which no margins were required. The "No. 2 Account" represented securities purchased for shipment to Atlanta and to be paid for after arrival. At the time of purchase of securities carried in the "No. 2 Account" margins were furnished by Rossignol & Crocy

Inc., and the balance due was paid upon delivery. Margin was required in the "Regular Account," and in general whenever the margins proved to be insufficient Rossignol & Crocy Inc., would, when their attention was called to the fact, give to Courts & Company a check to put their indebtedness in proper condition.

D. O. Smith had an account with Rossignol & Crocy Inc. Under date of October 1, 1934, he entered with such broker into a written contract reciting that "in consideration of your carrying an account for me as my brokers and in connection therewith" D. O. Smith agreed, among other things, that "you shall have the right to hypothecate, pledge, or use in any manner, either singly or in conjunction with your other customers' securities, all or any stocks, property, or securities held by you and belonging to me." The broker was to receive as compensation eight per cent. of the net profit made on the transactions handled by it. The contract also provided that the transactions entered into should be subject to the rules of the New York Stock Exchange and its clearing house, or of the exchange upon which any transaction might be consummated, and that D. O. Smith would keep a margin with Rossignol & Crocy Inc. On March 18, 1937, Smith gave to this broker an order to buy 50 shares of New York Central Railroad Company stock; and on March 22, 1937, he gave an order for the purchase of 25 shares of the same stock. Rossignol & Crocy Inc. reported to Smith that the stock had been bought, and he thereupon paid $2663.25 for the 50 shares and $1281.63 for the 25 shares. D. O. Smith never made any demand on Rossignol & Crocy Inc. for the stock. On March 18, 1937, this broker gave to Courts & Company an order to buy 50 shares of New York Central Railroad Company stock. Courts & Company bought the stock and paid for it $2619.50. On March 27, 1937, Rossignol & Crocy Inc. gave Courts & Company an order to buy 25 shares of New York Central Railroad Company stock. The order was executed, Courts & Company paying therefor $1281.63. Certificates for the 75 shares of stock were received by Courts & Company from the persons from whom they had bought it. The transfers on the backs of the certificates were indorsed in blank. These certificates were thereafter retained by Courts & Company until they were sold on December 6, 1937, to satisfy in part the indebtedness of Rossignol & Crocy Inc. to Courts & Company. On December 2, 1937, the cashier of Courts & Company

killed himself. His employer then discovered for the first time that by manipulations and improper transactions with Rossignol & Crocy Inc. he had brought about an enormous loss in the accounts. It appears that for a number of drafts in the latter part of November, 1937, which the cashier had entered on the ledger as checks, he released to Rossignol & Crocy Inc. securities in large amounts, and that these drafts, as well as two checks for securities released about the same time, were all unpaid. It was shown that on December 31, 1937, Courts & Company charged off to profit and loss the sum of $453,356.20, and that at the time of the trial there was an unsecured balance due to Courts & Company in the sum of $23,120. Courts & Company knew that Rossignol & Crocy Inc. was a dealer in stocks and bonds, that it had customers, and received orders from them to buy and sell stocks and bonds. However, the names of the customers never appeared in any of the orders, Courts & Company had never heard of D. O. Smith, and he was wholly unknown to them in connection with the purchase of the stock alleged to have been converted.

On December 14, 1937, Smith was informed by Rossignol & Crocy Inc. that the stock which they had been instructed to buy for him, and for which he had paid, had been sold, and that there was a balance due to him by them of $1457.20, which they were unable to pay at that time. Thereupon Smith entered into a written contract, reciting that he had deposited money with them to purchase securities, that there was a balance due him of $1457.20, that the stock purchased for his account had been sold; and Smith agreed upon a settlement of the balance as set forth in the contract. The contract provided that Smith accept, and he did accept, a promissory note in the sum of $1457.20, signed by Rossignol & Crocy Inc., indorsed by J. R. Rossignol and A. C. Crocy individually, and providing that upon payment of the note in full D. O. Smith would release Rossignol & Crocy Inc. from any and all liability. The note was never paid, and was in the possession of the plaintiff at the time of the trial of the present case.

The general grounds and special grounds 1 and 3 of the motion for new trial may be treated together. Ground 1 complains that the court erred in admitting in evidence a number of drafts (accepted by the cashier of Courts & Company, without authority, for the release of certain securities held by Courts & Company)

which were protested for non-payment, over the objection that because Courts & Company failed to maintain, as required by the rules of the New York Stock Exchange, a marginal requirement of thirty per cent. in the account of Rossignol & Crocy Inc., they were estopped from showing that Rossignol & Crocy Inc. was indebted to them in any sum; that Courts & Company had knowledge of and were chargeable with knowledge of the defalcations of their cashier; that the cashier had a right to accept the drafts; that they were irrelevant and immaterial; that it nowhere appeared that they were carried as credits; and that, as there was nothing in the regular account to show that any of them were entered, their admission in evidence was prejudicial in that thereby Courts & Company were allowed to set off claims to which the plaintiff and his testate were not parties, against the claim of plaintiff sounding in tort. Ground 3 complains that the court erred in directing the verdict for the defendants, it being contended that the evidence showed conclusively that Courts & Company had notice and knowledge that Rossignol & Crocy Inc. was acting for D. O. Smith, and that Courts & Company were required to handle the transaction in accordance with the rules of the New York Stock Exchange, which required that a thirty per cent. margin be maintained in the account with Rossignol & Crocy Inc., and that because they failed to comply therewith the plaintiff was entitled to a directed verdict against the defendants. The defendants contend that under the law and the evidence they were entitled to a directed verdict, for three reasons: (1) that D. O. Smith authorized Rossignol & Crocy Inc. to pledge the stock in question, and was bound by its act as agent, and that under the contract with Rossignol & Crocy Inc., Courts & Company had the right to hold the stock as a pledge when bought, and to sell it to reduce the indebtedness; (2) that with full knowledge that the stock which he had directed Rossignol & Crocy Inc. to purchase for him had been sold, D. O. Smith accepted from it a promissory note for the balance due to him, and thereby waived and abandoned any right to follow the stock itself and recover it or its proceeds from the defendants or any other person; and (3) that under the contract which they had with Rossignol & Crocy Inc., Courts & Company purchased securities, including the 75 shares of stock here involved, for Rossignol & Crocy Inc. and dealt with that corporation as a principal; that they extended credit to it, paying for the stock, and

that they are still a creditor in an enormous sum; that though they knew that the orders given by Rossignol & Crocy Inc. to buy and sell securities in this account were for customers of Rossignol & Crocy Inc., they did not know D. O. Smith, and the fact that Rossignol & Crocy Inc. was a broker and dealer in securities did not put them on notice of any rights of D. O. Smith that would defeat the validity of the pledge of the 75 shares of stock in question to Courts & Company for the price thereof, and other indebtedness of Rossignol & Crocy Inc. to Courts & Company.

Without passing on the merits of the other grounds, we think that for the reasons first advanced the court properly directed the verdict for the defendants. It appears that under date of October 1, 1934, D. O. Smith entered into a written agreement with Rossignol & Crocy Inc., whereby, in consideration of Rossignol & Crocy Inc. opening with him an account as his broker in the purchase of stocks and other securities, Smith gave them very broad powers with respect to the handling of the securities to be purchased, agreeing that "you shall have the right to hypothecate, pledge, or use in any manner, either singly or in conjunction with your other customers' securities, all or any stocks, property, or securities held by you and belonging to me." How many transactions were had under this agreement does not appear from the evidence, but it is inferential that he reposed full confidence in the broker, because, although notified in March, 1937, that his order for the purchase of 75 shares of New York Central Railroad Company stock had been executed through Courts & Company, he acquiesced in their nondelivery at least until the stock was sold in December, 1937. This contract did not limit the pledge or use of securities to such as were bought on margin, but, in consideration of the relationship of broker and customer and the opening of an account so that stocks might be purchased on the New York Stock Exchange for him, authorized the use *in any manner* of stocks which belonged to him, subject, however, to the rules of the New York Stock Exchange. This power to pledge was as full and complete as if Smith had indorsed in blank and turned over to his broker a certificate of stock for use in any manner. Courts & Company likewise had similar authority from Rossignol & Crocy Inc., with respect to any securities which they were carrying in the latter's account. It is contended by the plaintiff, however, that Courts & Company knew that in dealing

with them Rossignol & Crocy Inc. was representing customers; and that as the money for the 75 shares of stock had been paid by Smith, the title to the stock vested in him when bought by Courts & Company, and that the sale thereof by Courts & Company constituted a conversion. Assuming but not deciding that under the facts of the case title to the stock was in Smith when bought, still a certificate of stock of this nature may be pledged with the express or implied consent of the owner. As stated in Richardson *v.* Shaw, 209 U. S. 365, 379, to which we are referred by counsel for the plaintiff on the question of ownership, "Nor is the right to repledge inconsistent with ownership of the stock of the customer." In Jones on Collateral Securities, § 53, it is stated: "But it is not indispensable in all cases that the pledge should belong to the pledgor. One may make a valid pledge of property belonging to another, if he has the owner's consent to use it in this way. Such consent may be express or implied." In Bardsley *v.* First National Bank & Trust Co., N. J. (168 Atl. 665), the rule stated by Jones was quoted with approval.

Clearly in the present case D. O. Smith could authorize Rossignol & Crocy Inc., as agent, to do what he himself could do. Acting under the authorization to deal with the stock *in any manner,* Smith's broker and agent pledged it under the general terms of the contract with Courts & Company, which contract provided for the sale of any securities held by them in the account of Rossignol & Crocy Inc. whenever it became necessary to reduce the indebtedness. Courts & Company discovered, shortly after their cashier committed suicide on December 2, 1937, that, by unauthorized acceptance of drafts which subsequently were returned unpaid, he had released securities in the Rossignol & Crocy Inc. account to such an extent that an enormous indebtedness existed without marginal protection. These drafts had been entered as checks, and the ledger did not disclose that the account was not in proper condition. Upon discovery of the cashier's defalcation and false entries, Courts & Company, to reduce the indebtedness, and acting under the written contract with Rossignol & Crocy Inc., sold the securities which they had been holding in that account. Among these securities were the 75 shares of stock which Smith had instructed Rossignol & Crocy Inc. to purchase and which in turn they ordered through Courts & Company. It is contended by the

plaintiff that if Courts & Company had maintained the proper marginal requirement of thirty per cent., as the evidence shows the rules of the New York Stock Exchange prescribed, the stock purchased for Smith would have been clear, that is, free from the necessity of marginal requirements, and there would have been no occasion for selling it. As stated above, however, the ledger did not disclose any lack of proper margin, and it is not contended that but for the defalcation and fraudulent conduct of Courts & Company's cashier there would have been any lack of proper margin, and they had had no reason to suspect any irregularities. We are cited to the provisions of the securities exchange act of 1934 (15 U. S. C. A., 1938 Cumulative Annual Pocket Part, 116, § 78a et seq.), as to the necessity of maintaining proper margin; but it can not be said that Courts & Company are shown to have acted otherwise than in good faith. They intended to have and believed they had the legally required margin in the account of Rossignol & Crocy Inc., and were not knowingly violating any law in the interval pending their discovery of the cashier's misconduct. Indeed, the securities exchange act recognizes that failure to know of lack of proper margin is not inconsistent with good faith and prudence; for it is provided in the act (15 U. S. C. A., 1938 Cumulative Annual Pocket Part, p. 149, § 78cc, subsection (c), that "nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made, or of any lien created prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension of credit (or extension or renewal thereof), or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) or the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien."

It is further contended by the plaintiff that the evidence showed that since the purchase of the stock in question Rossignol & Crocy Inc. had paid Courts & Company $7500 on November 9, 1937, $17,752.50 on November 12, 1937, and $16,500 on November 19, 1937, and that the total more than paid for the purchase-price of the stock; that, it not being shown that Rossignol & Crocy Inc. directed how the payments should be applied or that Courts & Company had applied them otherwise, the payments must, under the law, be applied against the oldest items on the account, and that so applied the stock would be paid for. There is no evidence that Rossignol & Crocy Inc. did not direct how these payments should be applied or that Courts & Company did not apply them against debits older than the amount due for the 75 shares of stock.

The court did not err in admitting in evidence the drafts referred to in the motion for new trial, inasmuch as they were relevant and material to show the manner in which the marginal securities had been released by the unauthorized act of the cashier of Courts & Company; and for the reasons above stated they were not estopped from showing the resulting unsecured indebtedness of Rossignol & Crocy Inc., making it necessary for them to avail themselves of the authority, under the contract with Rossignol & Crocy Inc., to sell all securities held by them, including the stock sued for, to reduce the indebtedness as much as possible. The contention that it nowhere appears that these drafts were carried as credits is overborne by the ledger sheets and testimony, which show that the cashier entered them as "checks" in the respective amounts of the drafts. What is said in the foregoing part of this opinion is also conclusive adversely to the plaintiff's contention that the defendants were not entitled to a directed verdict in their favor.

■ Special ground 2 complains that the court erred in admitting in evidence the note referred to in the statement of facts as having been accepted by D. O. Smith from Rossignol & Crocy Inc., which note was admitted in evidence along with the contract entered into between those parties on December 14, 1937, after Smith had been advised that the 75 shares of stock had been sold; it being contended that this evidence was prejudicial and harmful to the plaintiff, because, being "irrelevant and imma-

terial," the contract and note were offered as showing a release by Smith, whereas the contract shows that the note was not to operate as a release until it was paid, and the evidence showed that he had never been paid. Inasmuch as a verdict in favor of the defendants was demanded under the evidence with respect to the right of Courts & Company to sell the stock involved in the present suit, the introduction of the note on the question whether or not Smith had waived and abandoned his right to the stock or its proceeds was not harmful error as against the plaintiff.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*